on behalf of the Avalon, Ms. Catherine Saunders, on behalf of the Avali, Ms. Marion Cruz. Good morning. Presiding Justice Zinov, due to circumstances beyond her control, is unable to be here today, but she has informed us that she will listen to the audio tapes of the oral argument today. With that, Ms. Saunders, you may proceed. Good morning. Before I even begin, Your Honor, I wanted to let you know I've got a horrible head cold, so that if I appear to ignore a question that's coming from the court, I do apologize in advance. Well, we'll speak up, so. Okay, thank you. As I said, may it please the court, counsel, I'm Assistant Attorney General Catherine Saunders, on behalf of the people in this case. The trial court's judgment here granting conditional release to this respondent was unreasonable and should be reversed for an abuse of discretion. Now, admittedly, the abuse of discretion standard is a deferential one, but this case warrants reversal even under that standard. As this court is well aware, a trial court judgment constitutes an abuse of discretion that is arbitrary, fanciful, or unreasonable, and we don't contend by any means that the court's judgment was arbitrary or fanciful, but it was unreasonable in light of the evidence that was presented at the disposition hearing in this case. The court's judgment ordering a respondent conditionally released here was unreasonable in light of the respondent's 30-year history of sexually offending against young boys. By his own report, he offended against 30 boys, many of them multiple times over the course of years. He began sexually offending against young boys in 72, and he didn't stop offending until shortly before he was arrested on the underlying DuPage County convictions. So after he was ordained in 1972, he went to St. Peter's and Paul Church in Naperville, and he abused three boys there. From there, he went to St. Charles Borromeo High School and molested three boys there. Then he went to St. Isaac's in Moonsdale. There were three boys there. His offenses resulted in DuPage County convictions, but he was confronted by one of the fathers of one of his victims there, and he admitted that, well, yes, he had 11 more victims, actually, and shortly after that, he was sent to the House of Affirmation in California. But even after he was caught and sent away to the House of Affirmation, he continued to reoffend. There were five more boys he victimized at St. Peter's Parish in Pacifica, California. I take it you're arguing you're focusing on the first two factors in the statute, correct? Pardon me? You're focusing on the first two factors in the statute that the trial court was supposed to look at, which is the mental history, the present mental history, any prior treatment, as well as the offenses, correct? Right, exactly, yes, the first two factors, the Section 40 factors, the nature of the behavior that was the basis of the petition, as well as his mental history and his current mental health, yes. Now, you would agree that the last three factors did, in fact, weigh in favor of the petitioner, I guess it would be. I'm sorry to respond, but correct? No, I would not agree that the third factor, where he will live and how he will support himself, those factors don't carry very much weight. In fact, the legislature has since deleted them from the SPP statute, so expressing our intent that maybe they just shouldn't carry as much weight in this case. In 1972, how old was the priest? Pardon me? In 1972, what was his age? He was 28 in 1972. And then when he appeared before Judge Wheaton, how old was he at this time on this sexual assault charge? At the time of disposition, he was 65, so he was somewhere around 64, perhaps, at the time of the trial. And she took that into consideration, correct? She took that into consideration, his age, he was going to be living with his sister, he was no longer going to be in a church around children, correct? That's correct, but that calls to mind actually two points in favor of our argument, because, one, statistically, age can be, some of the experts in the sex offender treatment field believe that age can be a protective factor, although there is dispute among the psychological community. But even respondent's own expert, Dr. Gaskell, admitted that in his 50s, when statistically one would be less likely to reoffend, this respondent's risk of reoffending was actually 100%, so that age isn't really a protective factor for him. And as far as not being in the church, yes, the trial judge and respondent's experts all erroneously believe that this somehow, the fact that he was not going to be, you know, a priest practicing in a church, that he somehow wouldn't have access to his chosen class of victims, which is young boys, when really he wasn't attracted particularly to Catholic boys or altar boys. Instead, he liked boys who had a certain type of body build that he had defeated as a child. And there's no reason to believe that because he would, you know, no longer be acting as a priest, that he wouldn't be able to somehow get these same kind of boys along and, you know, continue his pattern of reoffending. The trial judge had before her four experts who testified at the original trial, the SVP trial. Yes, the adjudicatory phase. And then at the dispositional hearing, three experts testified, correct? Correct. And basically, there were two experts on one side who said detention, and two experts on the other side who said conditional release. Correct. And, I mean, are you not asking us to basically do the trial court's job and weigh this testimony anew? No, Your Honor, because, well, actually, yes, I am, because... And we're not supposed to do that. We're supposed to look at whether the trial judge abused her discretion in this finding. Correct. But contributing to the trial court's erroneous judgment here was a painfully erroneous evaluation of the people's expert, Dr. Phoenix's, credibility. The trial judge stated that, well, Dr. Phoenix had somehow arbitrarily rescored the actuarials and changed her opinion on the respondent's risk of reoffending over time. And, in fact, the opposite conclusion is apparent from the record, that this was not the case. So in light of the trial court's painfully erroneous credibility determination, this court can confirm that that was, in fact, an erroneous determination and consider that in reversing for an abuse of discretion. Explain to us how that was erroneous in light of the doctor's indication that she was assuming that this contact was with a young child as opposed to as reported with an adult male. The self-report... Am I getting that correct? Wasn't she assuming that, or was she not assuming that? There was a self-report on the able assessment of sexual interest. Respondent self-reported that he had encounters or sex with a stranger three times with three different victims. Based on the respondent's self-report, she gave him an extra point for sex with a stranger. Now, sex with a stranger can be coded as an extra point on the actuaries, only if, in fact, it is an underage stranger. And based on his previous history of never having offended against adults or even apparently having sex with adults, she disbelieved his statement that it was an adult. Could it have been this trip to this men's club or whatever it was? Is that what we're talking about here? It's somewhat confusing from the record as far as what exactly we talk about the self-report. What was the self-report? The self-report was given on the able assessment of sexual interest. It's a psychological test. I know what an able assessment is, but what was the self-report? The self-report was an item on that test, the ASI, where he said that he had had sex with strangers between the ages of 39 and 52, three times with three different victims. So the statement within the able assessment was the self-report that caused Dr. Phoenix to add the additional point for sex with a stranger. She made the reasonable inference or she kind of went and said it must have been kids because he's never had sex with a woman. Correct. She made a reasonable inference based on his prior effect. And, you know, all of this is self-report, and experts don't necessarily believe everything. They're entitled to disbelieve certain aspects, but it's all self-reported. But based on that, yes, she gave him an extra point. But beside that fact, there's also the fact that Dr. Phoenix said even if she were somehow hypothetically forced to change her score back from a 4 to a 3, it wouldn't change her opinion on his risk of offending because it wasn't just the actuarial scores that informed her decision, but instead all the dynamic risk factors and his 30-year history of offending without ever having received treatment. But, again, she testified to that before the court, correct? Pardon me? She testified to that before the court? Yes. So the court could weigh that statement? Yes. But it's our contention that she weighed it. The trial judge, her credibility determination was simply erroneous on that point. She said she arbitrarily, you know, she had changed her opinion of him on his risk of offending over time, but she simply had not changed her opinion. Her opinion remained the same, and the record will confirm that to this court. Do you think that could have been a misstatement, that the trial judge was saying that the expert was bolstering her opinion with this new score as opposed to changing her opinion? Because, I mean, this Dr. Phoenix testified at both the SVP trial and the dispositional hearing that it was her opinion, and she never wavered, that the respondent was a danger to the public and should be detained. Yes. So, I mean, she never changed her opinion in that regard. She never changed her opinion. I mean, certainly the court was aware of that. Should have been aware of it, but, Your Honor, I suggest that based on the trial judge's statements in the record, she was unaware of that. She was actually, she held the, incorrectly was of the opinion that somehow Dr. Phoenix had changed her opinion over time. That's what she says on the record. Can you address, Judge Wheaton used, a couple of times stated that she was required to select the least restrictive alternative for the respondent. Yes. What's your opinion on that, that least restrictive alternative? That's absolutely correct. Judge Wheaton was correct. The statute calls for the least restrictive alternative consistent with the security needs of the people and the treatment needs of the respondent. And it's the people's position in this case, of course, that the respondent's 30-year history of offending against young boys by his own report he had over 31 victims. And the fact that he continued to reoffend after he was caught, after he was sent to the House of Affirmation, while he was in treatment, all of that militates in favor of secure care. And the same facts also militate in favor of the more intensive course of treatment that respondent could receive. Maybe I read the statute differently from you, but my understanding of the statute is that the court has to weigh these factors and then decide either secure treatment or community-based treatment, correct? Correct. And after the court makes that decision, then it's up to the Department of Human Services to decide the least restrictive treatment based upon the court's findings. Anywhere in the Act does it say least restrictive? Yes, it does say least restrictive alternative in the Act. Well, but the least restrictive language, maybe again, if I'm wrong, tell me, but my understanding of the Act, the least restrictive language is directed at the Department of Human Services and how they're supposed to deal with the person once the court makes a decision based upon these factors and that the court is not under the obligation to make the least restrictive determination here. This is not my understanding of the statute, Your Honor. No, the trial judge is required to make a disposition under Section 40, the least restrictive alternative, again, considering the need for security of the people as well as the treatment needs of the respondent and considering the Section 40B factor. So as I said, the respondent's lengthy history of abuse militates in favor of secure care, and the trial court's judgment was unreasonable because all of his prior attempts at community-based treatment had failed. In 1983, he had seen a Father Joyce for treatment. After that treatment was discontinued, he continued to actually be offended much more frequently. He briefed Stanford Treatment in 1984. In 1985, of course, as I mentioned, he was sent to the House of Affirmation for ten and a half months. And then for 1985 to 1990, five years, he continued outpatient treatment with a Dr. Barlini who had been affiliated with the House of Affirmation. All these treatment attempts, approximately five, six years of treatment, were failures, and respondent requires the 30 hours of treatment that he'll receive in the TDF. The trial court's judgment was unreasonable because all of the experts, both the people's experts and respondent's experts, agreed that the respondent suffers from pedophilia. It's a lifelong, pervasive condition. It can't be cured ever. It can't be treated. So one of the experts likened it to diabetes in that respect. After three years of treatment in the TDF, he had been there for his third treatment in 2006, and by the time of the disposition in 2009, he'd been in treatment for about three years. He was still only in the early part of phase two of treatment. And to put that in perspective for the court, phase one isn't really treatment at all. It's an assessment phase when the detainees come in. They're given a battery of tests, psychological tests, a PPG, things of that nature, to assess where they are. So phase two is really the very beginning of the actual therapeutic treatment. It's called accepting responsibility. He was still, after three years, only in the early part of that phase of treatment. And phase three has the relapse prevention plan, correct? Relapse prevention doesn't come until phase four, Your Honor. Phase four. Phase four, yes. I have the notes here somewhere where it explains all of this. Number two, phase two is accepting responsibility, and after which they have to prepare a polygraph questionnaire about all of their offenses. And when they pass that, they can pass into phase three. And that's where they work on their offense cycles and the offense triggers, how and why they reoffend and become acquainted with that. And phase four is when they prepare the relapse prevention plan. All right, your time is up. You'll have time for rebuttal, okay? Thank you, Your Honor. Counsel, perhaps you could indicate where was the respondent in this treatment? Apparently he was in treatment for three years prior to the dispositional hearing but had only attained phase two. Is that correct? That is correct, Your Honor. He was three years and four months at the time of the dispositional hearing. He self-reported during his evaluations that one of the reasons why he believed he hadn't gone into a different phase or succeeded into a different phase is he was taking longer with his assignments. And it reflects in the record that he wanted it to be a meaningful exercise, so it wasn't about him trying to just get it finished and check boxes in his program, but rather he was taking a meaningful approach. And if you review the record, Dr. Wazzaloo actually looked to that as a positive factor in Mr. Linczycki's willingness and cooperativeness with treatment. So even though he hadn't completed all phases of the treatment, the statutory construction that was intended or thought of by the legislature actually anticipates that some of these individuals would still be able to go into the community and receive treatment through these phases after having been released from the detention facility. And actually there was evidence presented to Judge Wheaton as to success stories where people have actually gone out on conditional release, even though they hadn't completed all the phases and had not returned to the detention facility. And as you'll see from the record, once a person who's on conditional release violates any of the violations, they immediately get returned to the detention facility. And the judge made the finding that he was cooperating in this treatment? Yes, he was not only cooperating, he was doing well in the facility. He was a pod leader. He also held employment. He was a librarian. And in terms of his getting along with peers, he had group therapy. And so it was a positive experience for him. He was engaging in every single session. So that evidence was before Judge Wheaton. And I think that goes to some of the factors, especially the final factor, which is whether or not arrangements could be made and arranged for the respondent to participate in meaningful treatment. And she heard from two of the doctors that there were two different Chicagoland area facilities that could treat him, one of which had a history of dealing with sexually violent persons, such as Mr. Linczycki, and also that arrangements would be made pursuant to the health care plan by the Department of Health Services to get him to treatment. And part of the conditional release conditions require him to be in treatment. I would think that the court would consider relapse prevention as a priority. The respondent had not engaged in relapse prevention planning or whatever until Phase 4, so he was not engaged in that at the time of this dispositional hearing. Did the experts who favored conditional release comment on that at all? They did. Dr. Gaskell, who was the independent state expert, did state that he had begun doing some exercises in relapse prevention, but the relapse prevention phase had not been completed. But relapse prevention is a part of the earlier phases as well, because what it looks into is what your triggers are. And Dr. Gaskell and Dr. Wazalu, the experts that testified for the respondent, did talk about Mr. Linczycki's recognition of what his triggers were. You know, he recognized that his triggers were, you know, young boys, the thoughts that he would have would lead to certain behaviors. And while he hadn't completed that phase, he was doing Phase 3 work. That is in the record, that he hadn't completed that phase, but he was doing work along those lines. Just briefly, Your Honors, I'm going to go through a couple of arguments that were not raised by appellant. First, the fact that the appellant did not file a post-trial motion in writing constitutes a waiver of the issues that they now raise on appeal. I presume that on a rebuttal, appellant will say that this was a non-jury case and, therefore, Rule 366A.3.2 would apply. I submit to the court that this was a jury case, even though the jury determination occurred in March of 2008. It retained the same case name, same case number, same judge, same counsel. And much like a criminal case, the determination was made by a jury, but the disposition was made by Judge Wheaton. That being the case, an oral motion was required. It was not filed here. I'm sorry, a written motion was required. It was not filed here. And even if an oral motion was sufficient, the manner in which it was made in this case did not suffice, because when asked by Judge Wheaton, is there an objection to my entering this order, the Attorney General, the Assistant State Attorney General said, yes. And I quote, we fought a hard fight. We contested the conditional release. And so the basis of my objection is based on all the things you heard in the CR, I'm sorry, conditional release hearing. Well, that simply isn't enough to say in wholesale I object to the entire trial or the entire proceeding. And therefore, whether oral or written motion is required by this court, appellant failed to meet any of those requirements. Even though the order appealed from is the conditional release order at the dispositional hearing? Correct. I'm sorry, the dispositional hearing, yes, on July, and also the entering of the order was in September. The oral motion was made in September. That just did not suffice, because it's still a jury case at that point in time. The cases that we cite, the respondent cites is in Ray, detention of Lieberman, which is an SVP case, which is on point. No other cases cited by the appellant are on point on this issue. This is a 2007 case, the most recent in comparison to the other cases as well. Therefore, we ask that the respondent ask that you determine or come to the conclusion that the appellant has waived the issues that they raised upon appeal. Moving on to my next argument. The trial court judge, Judge Wheaton, did not abuse her discretion in ordering Mr. Limczyk the unconditional release. Appellant has conceded that her determinations were not arbitrary or fanciful, but were unreasonable. And they did focus on, as your Honor noticed, the first two factors in the five factors that she looked to. First of all, there's ample evidence in the record that Judge Wheaton had a reasonable basis to put Mr. Limczyk on conditional release. Looking to the first two factors. First of all, the first factor looks to the nature and circumstances of the behavior that's the basis for the allegations in the petition. So specifically, those are the three offenses that occurred at St. Isaac's and that Mr. Limczyk pled guilty to. At this point in time, at the dispositional phase and at the SVP proceeding, the appellant, the Attorney General's office, has many, many times pounded on his head 30 different offenses. But we're looking to the three. That's what the statute requires. And of course, you just basically put those other 27 out of its nine when it's making a decision on the protection of the public. No, I understand that concern, your Honor. And to that I say, even if we look at the other 27, none of those offenses rise to the level of what we normally or routinely see in SVP cases. There was no penetration. There was no physical injury. And there was no physical harm. And so if we look at, for example, other SVP cases, I mean, these cases are always going to include unsavory conduct. The statute anticipates that, and that's why when you get to the dispositional phase, you do look at the nature and circumstances of the behavior alleged in the complaint. I submit to you that whether we look at the three or we look at the 30, they're all pretty much in the same realm. There was touching and fondling under a ruse of a costume, trying on or a questionnaire. You're not arguing that if the court was convinced that this respondent would reoffend if released into the community, that the court would simply release the person to the community because there's no penetration involved in the act? I mean, you're not really arguing that. No, I'm not. Absolutely not. My argument or my submission to you today is that Judge Wheaton was aware of all these acts and all these offenses and the nature of those acts. She was very aware. I mean, she said in her ruling that these are horrible offenses. She's not going to take that away from him. And Mr. Linzicki was shown during his evaluations to be remorseful. But when we look to the nature of the offenses and then we combine that with the other factors, Judge Wheaton was not unreasonable in determining what she did. When you look to the second factor. Over what period of time were these offenses? Over 30 years. Okay. So we're talking about 30-year history of offending with no substantial sex offender-specific treatment until he's in the SVP program, correct? That's true. And the reason that actually it could go either way, but one or both of the respondents' experts said that that's significant because when you look to what he was doing that whole time, he was unchecked by the Catholic Church. He was not found out by the police. He was never arrested until 2003, I believe. So he wasn't in the same situation that he's been in for the last four years. Now he knows what can happen if he does reoffend. He has had many moments of solitude to think about it. He had to journal every day about these offenses, and he had to actually recreate these offenses to pass his polygraph. Because what they do is they make you talk about what you've done, and then they ask you on polygraph, and if those two things don't line up, you can't move on to the next phase. And so the difference here is while Mr. Lenzicki went 30 years offending, when he finally did stop and he was finally caught, frankly, he was a model prisoner, for one, and a model person being retained at the detention facility. He never skipped treatment, and he never tried to duck out of his responsibilities under the act. And also, he agreed to all the evaluations that were taken of him, and he's been through many. The other factor looks to Mr. Lenzicki's mental history and present mental condition. Admittedly, Mr. Lenzicki has been diagnosed by all experts in this case as having pedophilia. That is a lifelong disease. We do not contest that. But what's positive is that he has no other mental disorders, such as being a psychopath. And his report notes show that he is, again, affected well by treatment, is willing to do treatment, responsible to it, and is the kind of person who has characteristics that would bode well in the community. For example, he held a job while he was at Rushville as well as a detention center, which is what he would have to do in the community. He dealt well with his peers. The fact that he's not a psychopath also suggests that he's truthful. And so that those factors weigh in favor of Mr. Lenzicki. And, again, the SVP statute anticipates that anyone that's adjudicated to be an SVP does have a mental disorder because that's one of the factors that you take into place. So that alone can't be a factor that weighs against Mr. Lenzicki. Can you weigh in on this least restrictive treatment discussion that we've had before? Sure. Be glad to, Your Honor. In terms of the statute, my understanding is that the judge was not in error in considering that part of the statute as to be part of her – in her purview. But it wasn't raised by the appellants. And in my opinion, if it was error, it was harmless. And here's why. Because the factors look to – that we look to, the five factors, they sort of encompass that already. You know, the fact that we even have a conditional release option for these SVPs shows that there are some individuals, despite what they had done, if they had progressed a certain way and shown that they can be safely managed in the community, could be put on conditional release. And so another aspect of her looking to that is that I think maybe what she was also considering is that she knew that the plan that Mr. Lenzicki would have to live under if on conditional release would have to be, A, blessed by her, and, B, she would have the power to and did in this case add additional restrictions. There's 28 restrictions that come along with the statute just per se. She added 14 more. I don't know if my math is right, but it's 42 restrictions at the end of the day. And one of the ones she added was that he couldn't practice any priestly duties or wear his clerical garb because she was really concerned that that was what – you know, that was sort of his MO in this case in terms of what he did to offend. And so I guess the short answer is while I do believe that Judge Wheaton was not an error in considering the least restrictive option for Mr. Lenzicki, if it is an error seen by the court, it was harmless because she already considered those other factors as a part of her decision, which is included in that part of the statute. The last three factors I'm not going to get too far into. It seems like the court is aware and is on point with those. But there was testimony about where he would live as well as him being supported by his sisters. And arrangements were available in the community, and there was plenty of testimony as to that. Lastly, I just want to briefly touch on the Dr. Phoenix issue in terms of her credibility. Your Honor stated earlier that maybe it was just a misstatement on Judge Wheaton's part saying that maybe Dr. Phoenix was bolstering her opinion. Dr. Phoenix, at the end of the day, said it wouldn't change my opinion at all. She did say that. That alone is a credibility issue because Dr. Phoenix had come up with these additional factors to add to the Stat 99 factors that were dynamic factors. And she was always, within the trial, within the disposition hearing, she was always trying to come up with ways to raise Mr. Linzycki's score and risk. If you would sum up, please. Your time is up. Thank you. Dr. Phoenix's credibility determination was in the purview of the court. The trial court is given great deference because they're able to see the witnesses' credibility and their responses to questions. And I submit that this court does not disturb the ruling that was made by Judge Wheaton on all of the issues raised on appeal. Thank you. Can I ask one quick question? Under the sexual and violent persons petition, the reasoning, the basis behind it is this individual is so dangerous to others because of a mental disease or disorder that it creates a strong probability or a substantial probability that he would engage in acts of sexual violence or sexual behavior. Doesn't that make it even more important that he be further along in treatment before he's released from the community? I think, you know, some would say somebody who's considered a sexually violent person is somebody who you really can't ever make a pedophile not a pedophile any longer. You're just trying to train their behavior. You're just trying to educate them. Wouldn't that make it even that much more imperative that he be further along in treatment before he is released out into the community? Well, I think in order to answer that question, we have to look to what kind of conditions are placed on him while he's out in the community because it's unfair to say he really is released like one of us. He is up until this day being monitored by GPS with an ankle bracelet. He cannot leave his home without telling his conditional release agent. Up until this day, which is over a year later, he can only see individuals who have been previously approved by the department, which is his two sisters, his brother, and maybe two older friends in their 60s, older as in non-child. He has absolutely no contact with children. If he is even close to a school or a playground or anything that where children congregate, the GPS system will alert the people monitoring Mr. Linzycki. And so the answer to your question is yes, it's very important that we have Mr. Linzycki treated, number one, which he is going through treatment right now, both group and individual, but that he be further along. My answer to that is that he's already participated in advanced phases of the treatment, so it's not as if he doesn't have any idea what a relapse prevention plan is, and he's currently going through these phases now in treatment. So the fact that he's in the community, so to speak, it's not like he's just free to roam wherever. And so the safety of the community obviously is a concern, but it's been dealt with to the highest extent possible. In fact, Judge Wheaton said these conditions are so restrictive, they're the most restrictive she's ever seen from a statute, much more restrictive than parole. Thank you. Thank you, Your Honor. Thank you, counsel. Ms. Saunders. If you could address the waiver issue first, please. Your Honor, the people have not waived the issue of conditional release versus secure care. People versus Lieberman, in fact, are in redetention of Lieberman. I'm sorry. The court reached the right result that the respondent had waived the issue because it was in a jury trial. It was a jury issue on the adjudicatory. But it reached it for the wrong reason by applying the criminal rules. Of course, these civil commitment proceedings are just that, they're civil. And under the civil rules, under Supreme Court rules, any non-jury issue, as this was, as the response disposition one, failure to make a post-trial motion or failure to make a motion simply doesn't waive an issue for review. And, in fact, the trial assistant for the people objected to the conditional release plan, the imposition of conditional release at trial, at the close of the disposition. And thus, the court had more than ample opportunity to reconsider her opinion, her disposition, which is exactly what that was supposed to preserve. So the people have not waived this issue. With respect to the statutory requirement here, it says, The department shall arrange for controlled care and treatment in the least restricted manner, consistent with the requirements of the person and in accordance with the court's commitment and order. Who shall? What were your first few words, who shall? The department shall arrange for the controlled care and treatment of the person in the least restricted manner, consistent with the requirements of the person, and in accordance with the court's commitment and order. We don't disagree here. The courts have read this to require that the disposition itself be the least restricted. So we don't disagree here. What we do disagree is that the least restricted environment in which this respondent can be housed, given his 30-year history of reoffending, his lack of progress, or his beginning progress in sex-medicated treatment is secure care. That's the point of disagreement here. As to the conditions on respondent's release, yes, there's GPS monitoring, but that just means we know where he is, not who he's with or what he's doing. So that's not going to prevent him from reoffending. Certainly there are more conditions in place for this individual that should safeguard against some issues, correct? Do you not agree that the court put a lot of conditions in place? Yes, there are 28 statutory conditions that just by virtue of law apply to any person on conditional release. But coupled with the fact that he's got a 30-year history of offending and he hasn't had any treatment, and the treatment he has had in the TDF for three years, he really hasn't progressed beyond the very earliest stages. He hasn't identified his offense triggers. He said to his own expert, he said, I'm afraid I'm at risk. I'm at risk of reoffending if I don't get a better handle on my desire. Respondent himself said that. And all the experts agree that he does suffer from pedophilia, and it's a lifelong disorder, and really he needs the kind of intensive, the 30 hours per week or the 15 hours per week he'd receive in the TDF versus the two and a half to three hours he receives on the outside in unconditional release. So in summing, the trial court's erroneous credibility determination, we're asking you to reconsider the trial court's credibility determination with Dr. Phoenix, but not to reweigh the evidence, simply that the trial judge made an erroneous credibility determination when the opposite conclusion is apparent from the record, that her rescoring of the actuarial illness was not arbitrary but in fact based on her clinical judgment and based on a self-report of a stranger victim. The judge's credibility determination, her erroneous determination, led her to undervalue Dr. Phoenix's testimony, which in turn contributed to her overall unreasonable judgment. He's got a 30-year history of offending against young boys. He obtained various ruses to obtain new victims. His numerous parties' attempts at treatment have failed. He continued to offend while he was in treatment, after civil lawsuits were filed, and he abused his position of trust and authority. He is making progress in treatment. As his counsel pointed out, he's motivated for treatment and he's been attending treatment, but the experts stated at trial that statistically those are positive factors, but statistically they have no relevance to whether he's going to reoffend. They're positives, but empirically they have no value. If this court has no further questions, we'd ask that the court reverse the judgment of the trial court and demand for a new disposition hearing. All right, I want to thank the attorneys for their arguments here today. The case will be taken under advisement with no decision made on due course.